**STATE of Missouri, Plaintiff-Respondent,**

v.

**James Ace MACONE, Defendant-Appellant.**

**No. 10665.**

Missouri Court of Appeals, Southern District, Division One.

May 9, 1979.

Motion for Rehearing or to Transfer Denied July 25, 1979.

Application to Transfer Denied Sept. 11, 1979.

Douglas M. Hamilton, Joplin, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

JAMES H. KEET, Jr., Special Judge.

Appellant was convicted of assault with intent to kill with malice aforethought and sentenced to the term of 30 years imprisonment, fixed by the jury. He appeals on two grounds, effectively preserved: (1) the state did not make a submissible case because it failed to prove that defendant acted with intent to kill a specific person (the alleged victim) as required under § 559.180 [1] and (2) the trial court erred prejudicially in allowing the playing, in front of the jury, of a tape recording purporting to be the voices of defendant and another because the tape was not intact and the playing was cumulative and its probative effect was outweighed by its prejudicial effect on the jury.

[1]. Unless otherwise indicated all references to rules are to Missouri Rules of Court, V.A.M.R.,

*Submissible Case?*

Defendant urges that there was no evidence indicating that the person firing the shots was aware of the location of any person in the house in which the shots were fired or that there was anyone in the house at that time and that the evidence merely shows that the shots were fired from a car into a darkened house. Defendant does not contend that the evidence was not sufficient to show that he fired shots into the house or that people were in the house at the time of the firing of the shots into the house. The jury could have reasonably found from the evidence the facts we now outline.

Mary Belew, manager of the Sonic Drive-In of Joplin, Missouri, was robbed by a man with a 22 calibre Ruger automatic pistol. On the following Sunday, September 5, 1976, just before midnight, she received a telephone call at her home from a man who called her by name; identified himself as the one who had robbed her; complained of not getting enough money in the robbery; said he would kill her and wanted $2,000 and if she did not get it he would kill her.

On Tuesday morning at about 1:00 A.M., September 7, 1976, Mrs. Belew received, and tape-recorded, another telephone call, involving two men. She recognized one of the voices as familiar and later figured out it was Joseph Conrow. The second participant was unknown to her by voice but she heard him referred to on the telephone as "James" or "Ames." Conrow threatened that if she did not bring the money to him, his partner would be killing her and her family. Subjected to other obscene suggestions, she was instructed to suck on the phone or have her family killed that night. Mrs. Belew said she would hang up but the caller said, "If you hang up now, you are dead." She hung up, but the rape recording continued to record the caller. A second voice, identified sufficiently in the evidence as that of appellant, said, "If you

and all references to statutes are to RSMo 1969, V.A.M.S.

hang up, Fat Mary, you are dead, you know that."

The telephone rang again. Nine gun shots then rang out. Seven bullets, fired from defendant's car, came into the Belew residence through the picture window of the front living room, one at a glancing angle. A couple of them imbedded in living room furniture. The lowest bullet hole in the picture window was approximately four feet above floor level. Bullets which passed through four thicknesses of glass (the double-glass picture window and the small windows that slide into it) broke and showered down on Mr. and Mrs. Belew. Bullet fragments and glass hit Mrs. Belew. There were bullet holes in the ceiling and walls. The telephone continued to ring while the shots were fired and Mrs. Belew, after the shooting ceased, answered it and heard the voice of Joseph Conrow, who said, "How do you like that, you are going to get a lot of that or we are going to get you . . . we are going to kill you."

During the shooting the lights in the Belew house were off, except the night light (in the middle room, which had no windows), which was on but projected no light into the living room. The curtains on the picture window were drawn. There was no light in the living room. There were yard lights in the immediate area outside the house and a vapor light in the back of it which shined into the Belews' kitchen. No light from the outside showed any objects in the living room. Mrs. Belew was on the couch which was projecting slightly into the area alongside the picture window, the lowest part of which was about thirty-four inches above the floor level of the living room. Upon hearing the shots she got off the couch and lay down next to and below the picture window.

Defendant urges *State v. Kester*, Mo., 201 S.W. 62 (1918) and *State v. Martin*, 342 Mo. 1089, 119 S.W.2d 298 (1939).

In *Kester* the defendant, a few days prior to the shooting, had threatened to kill the victim's husband after the latter had reprimanded defendant for cursing as he passed the house. The wife had been present but had not participated in this encounter, except to attempt to try to get her husband to go into the house. The opinion in *Kester* does not reveal that defendant had at any time threatened to kill the wife, the person he actually hit. In the case at bar the evidence is ample to show that defendant threatened to kill the very person he knew was in the house and could well have been hit by one of the bullets shot into the living room. In *Kester* the defendant fired merely in the direction of the house. Here, the shots were meant to enter the part of the house in which defendant had reason to believe Mrs. Belew might be at the time.[2]

*State v. Layton*, 332 Mo. 216, 58 S.W.2d 454 (1933) commented on *Mulhall* (see footnote 2) as holding that for a conviction under the statute in question there must be a showing "that the defendant shot at or otherwise assailed the person on whom the assault is charged to have been committed; and that he did so with intent to kill *that person*" and noted that *Kester* was ruled on this theory (at 457). In *Layton* the court stated that even if *Kester* "be good law," it did not destroy the state's case on a record which showed that defendant heard a noise behind a door opening onto the porch, and that the jury was warranted in finding that defendant "shot at the person behind the

---

2.  Judge Faris, concurring in *Kester*, stated, 201 S.W. at 64: "I have long doubted the correctness of the rule announced in *State v. Mulhall*, 199 Mo. 202, 97 S.W. 583, 7 L.R.A., N.S., 630, 8 Ann.Cas. 781, and *State v. Williamson*, 203 Mo. 591, 102 S.W. 519, 120 Am.St.Rep. 678, because I deem it opposed to good reasoning; to the weight of authority in other jurisdictions, and to the analogous rule in murder cases wherein the death alleged resulted from shooting at A., and striking and killing B., and wherein we say in effect that the intent follows the bullet. It is difficult, if not impossible, to differentiate between the species of intent required to be proven in such a trial for murder and the similarly named element in a trial upon the charge of assault with intent to kill.

However, since there are, ordinarily, at least two other sections under which prosecutions may be had upon the same facts (sections 4483 and 4498, R.S.1909), I hesitate to insist upon overruling the above cases and concur upon this point with reluctance and misgiving."

door intending to kill that person, although not knowing who was there" (at 457).

In *State v. Martin*, 342 Mo. 1089, 199 S.W.2d 298 (1938) the court reversed because the state failed to prove intent, there being no evidence that defendant knew that the alleged victim was in the cab at which the defendant threw acid while passing in another car. The court in ruling that the evidence did not warrant an inference that the defendant could have seen or known that the victim or any third party was in the cab, stated, at 301–302:

"We do not mean that he must know of each individual in the group. If he [accused] knows the probable consequence of the assault will be to injure any one or all of the persons he sees or otherwise is bound to believe are before him, he will be liable as to any one of them. But if, without his knowledge there be still another person present concealed, as behind a bush or wall for illustration, he would not be liable as to that person for he could have no specific intent as to him.[3]

\*  \*  \*  \*  \*  \*

"It would be pure speculation and conjecture to say on this record that the appellant and his confederates knew *or had reason to believe* DeCasnett [alleged victim] or any other third party was in the cab." (Emphasis supplied.)

As to Judge Faris' concurring opinion in *Kester* (expressing the view that the rule under the statute ought to be the same as it was at common law in homicide cases—that a constructive intent follows the bullet) the court stated, at 302:

"Whether that be so or not when injury results, it cannot be the law in a case like this where no one was hurt, and the State's case rests solely on the overt act of throwing the acid bulb and the felonious intent to be deduced therefrom. We cannot go so far as to extend it to a person not known to be there."[4]

Within the cases referred to herein, the evidence warranted the jury in finding that the defendant had the requisite intent to kill a specific person, Mrs. Belew. Threats to kill her had been made by telephone a day earlier and again within minutes of the shooting, a firearm was used, seven shots entered the living room, one at a four-foot level, when the assailant was aware that she was up and awake and might well be in the living room. The fact that seven shots were intentionally fired into different locations of the living room shows intent not just to shoot into the dwelling but to hit her if she happened to be in the line of fire. The telephone calls could be considered by the jury as indicating that the persons involved, by telephoning the Belew residence, intended that Mrs. Belew answer the telephone and therefore be up and around and exposed to gunfire.

It was within the province of the jury to consider the threats made, the nature of the weapon used, the manner of using it, and all of the related circumstances of the incident. *State v. Kopf*, 481 S.W.2d 7, 9 (Mo. 1972); *State v. Gannaway*, 313 S.W.2d 653, 656 (Mo. 1958).

We rule defendant's first point against him.

---

3.  *State v. Sarkis*, 313 S.W.2d 723 (Mo. 1958) quotes all but the first sentence of the language and notes that in *Martin* the defendant's act caused no injury to any person and that the defendant was charged with felonious assault on one "whose presence was not shown to be known to defendant." (at 727). The court held in *Sarkis* that the evidence was sufficient for a jury finding that shots fired into a tavern from a car were fired at the alleged victim, a person who had knocked defendant to the floor a few minutes before and was with numerous other people in the tavern.

4.  It is well settled that if one recklessly and maliciously (as the evidence showed in this case) discharges a firearm into a crowd, or into a house where he has reason to believe people are who may be hit by his bullet, his act imports a criminal intent and malice sufficient to constitute murder. *State v. Mills*, 352 Mo. 774, 179 S.W.2d 95, 97 (1944), citing *Layton*, in which the court had stated (p. 457) that there is no reason why the same rule should not apply when one shoots into a house or similar place where he has like reason to believe people are, who may or will be struck by the bullet. Cf. *State v. Anania*, 340 A.2d 207, 211 (Me. 1975); *Salisbury v. State*, 90 Tex.Cr.R. 438, 235 S.W. 901, 902 (1921).

## The Tape

■ The front portion of the tape had become inaudible by time of trial. The audible portion of the tape that included defendant's voice[5] contained: "Fat Mary? Are you there, Fat Mary? If you hang up, Fat Mary, you are dead, you know that. Do you hear me, Fat Mary? Fat Mary? Fat Mary, are you there?"

The trial court could reasonably have found from the evidence that the beginning part of the tape had deteriorated; the tape had been stored in the police department's evidence room; there was no indication of erasure; the front portion of the tape was old or of poor quality and had been used more than the later portion and hence was more subject to wear and deterioration; the tape had not been tampered with or changed; and, except for the front portion, was in substantially the same condition at trial as it was at the time of the recording.

The trial judge did not abuse his discretion in denying defendant's point that the tape was inadmissible because not "intact." *United States v. Brown,* 482 F.2d 1226 (8th Cir. 1973), cited by defendant in support of his argument that the tape was inadmissible because not "intact," does not, on the facts or under its statement of law, support defendant.

■ The trial court acted within its discretion in allowing the tape playing over defendant's objection of cumulativeness. This is so even it the playing was merely cumulative (which we believe is not the case). *State v. Wallace,* 504 S.W.2d 67, 71 (Mo. 1973), cert. den. 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 76 (1974). The state should not be unduly limited in the quantum of proof since it has the burden of proving guilt beyond a reasonable doubt. *Wallace,* supra; *State v. Lane,* 537 S.W.2d 569, 571 (Mo.App. 1976). The tape was clearly relevant on the issues of intent and identification and hence admissible. *State v. Johnson,* 539 S.W.2d 493, 518 (Mo.App. 1976), cert. den. 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *State v. McCabe,* 512 S.W.2d 442, 444 (Mo.App. 1974).

■ Defendant urges that the only reason the state could have had for playing the tape to the jury was to inflame the passions and prejudices of the jury and that the evidence did not reasonably tend to prove or disprove any disputed fact issue, citing *State v. Mucie,* 448 S.W.2d 879 (Mo. 1970), cert. den. 398 U.S. 938, 90 S.Ct. 1842, 26 L.Ed.2d 271 (1970). *Mucie,* however, was distinguished in *State v. Mullen,* 528 S.W.2d 517, 523 (Mo.App. 1975) to apply only where the facts proved are not in issue at all and not where the evidence tends to corroborate facts in issue. *Mucie* recognizes, at 887, that other evidence will not prohibit use of demonstrative evidence which, as in this case, tends to prove or disprove a fact in issue or to corroborate the testimony of a witness. See: *State v. Hudson,* 521 S.W.2d 41, 47 (Mo.App. 1975). The mere fact that it may tend to prejudice the jury against the accused does not necessarily render it inadmissible. *State v. Morrow,* 541 S.W.2d 738, 743 (Mo.App. 1976); *State v. King,* 334 S.W.2d 34, 38 (Mo. 1960).

■ The inadmissibility of potentially prejudicial or inflammatory evidence is within the trial court's broad discretion, because of his superior vantage point for balancing probative value and prejudicial effect of evidence. *State v. Richardson,* 515 S.W.2d 557, 560 (Mo.banc 1974); *State v. Johnson,* supra; *State v. Love,* 546 S.W.2d 441, 442 (Mo.App. 1977); *State v. Morrow,* supra. The trial judge did not abuse his discretion in ruling against defendant's objection at trial that its probative value was outweighed by its prejudicial effect on the jury.

We determine that defendant's second point is without merit.

We have considered the entire record in this case, including the lengthy proceedings on the motion to suppress. We find nothing in the record that would indicate that defendant did not have a fair trial or that any of his rights were prejudiced in such a way as to require that we interfere with the result below.

Affirmed.

5. Persuasively identified by Lt. Tennis and Detective Phillips.

FLANIGAN, C. J., TITUS, J., and CAMPBELL, BARKER and HENRY, Special Judges, concur.